**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: September 11, 2015

Mr. Mark Roy Bendure
Bendure & Thomas
645 Griswold, Suite 4100
Detroit, MI 48226

Mr. Christopher Kevin Cooke
12935 Bayshore Drive, S.W., Sute 370-B
Traverse City, MI 49684

Ms. Mary Massaron
Plunkett Cooney
38505 Woodward Avenue, Suite 2000
Bloomfield Hills, MI 48304

    Re: Case No. 13-2643, *Robert Carlson v. Scott Fewins, et al*
       Originating Case No. : 1:08-cv-00991

Dear Counsel,

  The court today announced its decision in the above-styled case.

  Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

         Yours very truly,

         Deborah S. Hunt, Clerk

         Cathryn Lovely
         Deputy Clerk

cc: Ms. Tracey Cordes

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0227p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

ROBERT CARLSON, Personal Representative of the Estate of Craig Carlson,

      *Plaintiff-Appellant*,

v.

SCOTT FEWINS; CHARLES JETTER, Individually and Officially; GRAND TRAVERSE COUNTY, a Municipal Corporation; STEVE DRZEWIECKI, Individually and Officially,

      *Defendants-Appellees*.

No. 13-2643

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:08-cv-00991—Paul Lewis Maloney, Chief District Judge.

Argued: April 29, 2015

Decided and Filed: September 11, 2015

Before: COLE, Chief Judge; MERRITT and BATCHELDER, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Mark R. Bendure, BENDURE & THOMAS, Detroit, Michigan, for Appellant. Christopher Kevin Cooke, COOKE LAW, PLLC, Traverse City, Michigan, for Appellees Fewins, Jetter, and Grand Traverse County. Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellee Drzewiecki. **ON BRIEF:** Mark R. Bendure, BENDURE & THOMAS, Detroit, Michigan, for Appellant. Christopher Kevin Cooke, COOKE LAW, PLLC, Traverse City, Michigan, for Appellees Fewins, Jetter, and Grand Traverse County. Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellee Drzewiecki.

No. 13-2643                          *Carlson v. Fewins, et al.*                          Page 2

---

### OPINION

---

MERRITT, Circuit Judge.  This is a Fourth Amendment, constitutional tort case brought under 42 U.S.C. § 1983[1] against Grand Traverse County, its sheriff, and other officers whose activities on the evening of November 9, 2007, and the next morning, ended in the death of Craig Carlson at his house.  In *Johnson v. United States*, 333 U.S. 10, 13–15 (1948), the Supreme Court pointed out succinctly the function of the Fourth Amendment warrant requirement[2] as an instrument designed to force law enforcement agencies to seek review and regulation of their proposed conduct by an independent judicial officer, despite its "inconvenience to the officers and some slight delay":

> The point of the Fourth Amendment, which is often not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence.  Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officers engaged in the often competitive enterprise of ferreting out crime.

*See also Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (quoting *Johnson*, 333 U.S. at 14).

Approximately sixty police officers converged on Craig Carlson's house beginning around 9:00 p.m. after telephone calls from family members indicated that Carlson, who was armed and dangerous, was threatening suicide while alone in his house.  The next morning, hours after their last contact with Carlson, officers broke the windows and flooded the house with tear gas.  The gas did not drive Carlson from his house as the officers intended.  When Carlson finally reacted, hours later, he began shouting and threatening officers in his yard.  A sniper, who

---

[1]"Every person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."  42 U.S.C. § 1983.

[2]"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.

No. 13-2643                          *Carlson v. Fewins, et al.*                          Page 3

believed Carlson was preparing to shoot one of those officers, shot through a window, killing Carlson.

The district court granted summary judgment to the county and the officers in charge of the operation who did not seek a warrant allowing them to attack Carlson's house with tear gas or seize him inside. We reverse this ruling and remand for a jury trial. The district court did not grant summary judgment in the case against the sniper who killed Carlson, but a jury returned a verdict in his favor. Carlson's Estate appealed various rulings in the jury trial, but we find no error and affirm the judgment below in that case.

## I. Factual Background

Supreme Court precedent instructs us to extend the normal benefits of "all justifiable [factual] inferences" to the nonmovant plaintiffs when reviewing a grant of summary judgment for the defendants. *Tolan v. Cotton*, 572 U.S. ___, ___, 134 S. Ct. 1861, 1863 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Accordingly, we recount the facts of this case in the light most favorable to Carlson's Estate.

The decedent, Craig Carlson, called 911 at 8:30 on the evening of November 9, 2007, and requested a visit from a deputy to "talk." Deputy Jason Hamilton had conducted similar "welfare checks" on Carlson the week before in response to calls from an anonymous caller and Carlson's sister, Jaqueline Smith, who each expressed concern that depression, a recent job loss, and pending domestic violence charges might lead Carlson to hurt himself. On those prior occasions, Hamilton noted that Carlson seemed intoxicated but "very passive." Following those visits and a conversation in which Smith indicated that Carlson was well armed and might get in a shootout with police if they tried to take him into custody, Hamilton had filed an internal report to help other officers respond appropriately to any future calls.

Smith also called 911 on November 9th to get help for her brother because she believed that he intended to die, perhaps by provoking a shootout. According to Smith, Carlson's "guns [we]re loaded" and he was "ready to die and put a bullet in his heart." Smith explained:

> He said he has one [gun] just empty and he's going to point it intentionally because he is dying tonight one way or another whether they shoot him or not and if they don't, he has guns hidden all over the house . . . everywhere that are loaded

No. 13-2643                     *Carlson v. Fewins, et al.*                     Page 4

and if he has to he'll shoot somebody in the knee or the arm forcing them to take him out.

She reported that Carlson had "like 2,000 rounds of ammunition." Robert Carlson—Carlson's brother and the personal representative of the Estate in this action—also called 911 that evening, reiterating his sister's concerns and reporting that Carlson had "already paid for his funeral." The family's calls indicated that Carlson "probably [wa]s armed and dangerous . . . [a]nd[] wanting probably to provoke an officer into shooting him so he wo[uld]n't have to do it himself, shoot himself."

Concerned that Carlson might try to provoke a shooting, a dispatcher called Carlson to let him know that a deputy sheriff was going to visit him and that the deputy would want to talk outside. Carlson rejected that idea, explaining that he had refreshments available ("pop, beer or coffee") and that he "ha[d] no desire, this is not a, I want to shoot you, you shoot me thing." Carlson eventually spoke with a state trooper by phone and reportedly felt better after discussing his problems.

Officers began arriving at Carlson's house at around 9:00 p.m.[3] They parked down the street to avoid detection and walked to the house. Carlson's house was well lit, and unobstructed windows provided a clear view into the house. The first two officers reported seeing Carlson in his basement loading a "long gun" and later putting a pistol to his own head. They waited outside in the dark for backup.

As more officers arrived, two took positions at the rear of the house to prevent Carlson from escaping unobserved. One of those officers saw Carlson open his sliding back door and fire a single shot into the woods shortly after 10:00 p.m. The parties agree that Carlson was unaware of the officers' locations at that time and was shooting to draw attention, though testimony from officers suggests Carlson may have believed they were near enough to hear him. The parties also agree that this was the only shot Carlson fired.

---

[3]The precise timing during the standoff is unclear. For example, the officers' testimony suggests they began arriving at 9:30 p.m., but the family testimony refers to "officers running around with their guns, putting lights up" as early as "around [nine] o'clock." The parties agree on the general arc of the conflict, and any disputes about precise timing are not dispositive. If they were, we would, of course, resolve any reasonable disputes in favor of the Estate at summary judgment.

No. 13-2643                    *Carlson v. Fewins, et al.*                    Page 5

Shortly thereafter, at Grand Traverse County Sheriff Scott Fewins's request, a large interdepartmental "Emergency Response Team" led by Traverse City Police Sergeant Steve Drzewiecki converged on Carlson's house. This Team included approximately sixty officers from various agencies with special training in weapons and tactics appropriate for potentially volatile encounters. They surrounded the house, working in shifts to maintain a secure perimeter throughout the cold November night. The Team flattened the tires on Carlson's truck to prevent him from escaping. They also escorted Carlson's neighbors to safety, leaving only a disabled man who spent the night in his basement with his wife until tear gas deployed against Carlson forced him to leave the area the following morning.

At the instruction of Fewins and Drzewiecki, a police negotiator telephoned Carlson at 11:30 p.m. and asked how they could resolve the situation. Carlson asked again for an officer to come inside and talk with him. The negotiator conferred with Fewins who rejected that plan, citing the prior shot into the woods. The negotiator reconnected with Carlson and explained that the prior gunshot made it impossible for an officer to come inside to speak with him. Carlson denied firing the gun and denied wanting to harm anyone. The negotiator confirmed the officers' reports of the gunshot and the weapons and called Carlson back. During the third call with the negotiator, Carlson became agitated and threatening. According to the negotiator, Carlson claimed falsely to have been a sniper in Beirut but still insisted that he did not want to hurt anyone. Carlson continued to ask to speak with an officer in person but also said he was ready for "war."

The Team shut off Carlson's gas line to deprive him of heat and set up lights to illuminate his house. They cut his electrical power. The negotiator testified that Carlson said, "I know at some point you are going to deploy tear gas, and when you do, that will be the start of the war. And I'm going [to] kill everybody." Carlson refused to answer the negotiator's calls after 3:30 a.m., but he continued making calls to his sister, leaving eleven voicemail messages in the early hours of November 10. She testified that 911 dispatchers asked her not to answer those calls, and she complied.

The Team maintained the siege of the house all night without seeking a warrant. They did request and receive coffee, granola bars, and hot chocolate. Fewins later indicated that he

No. 13-2643                     *Carlson v. Fewins, et al.*                     Page 6

never considered asking for a warrant because he believed it was unnecessary. Asked to explain why he would not need a warrant to arrest Carlson in his home, Fewins referred to his earlier speculation that the shot into the woods might have constituted "reckless discharge of a weapon"—a misdemeanor. He then justified his warrantless approach by explaining, hypothetically, what would have happened if he *had* requested and received a warrant:

> [N]ow we have a misdemeanor warrant. That warrant is not going to be easily served anyways, because, number one, it was committed in our presence, so we have the right to act upon that as soon as we can safely take him into custody. So we don't need the warrant.
>
> And the other thing is, even with the warrant, it does not put us in any better of a bargaining spot or any better of a position because it was still impossible for us to enter that residence and serve that warrant on him in his state being barricaded like he was. So the warrant would have been to no avail. The only time the warrant would have been handy is if we had decided to just vacate the area, leave Mr. Carlson alone, sleep it off, hopefully [sic] that he wouldn't go anywhere and hurt anybody or himself, and then serve the warrant at a later time.

Fewins Dep. 21.

After more than two hours without seeing or hearing anything from Carlson, the Team shot fourteen canisters of tear gas into his house, breaking every window and denting the siding. Carlson did not respond. About an hour later, and still without seeking a warrant, they fired a second round of tear gas. Carlson still did not respond. At 7:00 a.m.—more than nine hours into the standoff and still without a warrant—the Team tossed a "throw phone" through the broken living room window. The throw phone included basic telephone equipment that allowed the Team to "call" Carlson and give him a chance—which he never took—to answer the call. But it was not an ordinary telephone. Fewins emphasized that it would not allow Carlson to "call the radio station" or "to call, you know, an attorney." *Id.* at 41. It also contained secret microphones and a hidden camera that allowed the negotiator to surreptitiously listen to sounds in the house and could have allowed them to see inside. According to Fewins's deposition testimony, he "never" seeks a warrant before using throw phones.

The Team next saw Carlson moving around the house at around 9:00 a.m. A trio of deputy sheriffs—Travis Chellis and two others—had positioned themselves in Carlson's yard, not far away from the house. When Carlson started shouting about the damage to his house and

No. 13-2643   *Carlson v. Fewins, et al.*                                    Page 7

threatening to sue, Chellis requested permission to speak with Carlson and began a conversation. During the ten minute conversation, Carlson reportedly walked back and forth in front of a large window with a rifle pointing in the general direction of the three deputies in the yard and another gun visibly hanging from a strap around his neck. Chellis radioed a request for someone to get a "long gun with glass" (a rifle with a scope) on Carlson.

At trial, Jetter testified that the tone and substance of his friend Chellis's request over the radio left him with the impression that Chellis was in trouble. After hearing Chellis's radio message, Jetter decided to move to a better position with a clear view of the window. After notifying his commanders, he ran to the new location while watching the house. Jetter testified that after taking a new position with a better view of the window:

> [i]t was a matter of gathering a couple breaths, gathering my composure, thinking out loud[:] What is he doing? Why is he doing this? Oh my God, I'm going to have to shoot this person. I thought about my family. I thought about Sheriff Fewins. I thought[:] [W]hy is he doing this? Why is he moving his finger? Oh, my. I had to take a breath, and that's when I shot.

Jetter's bullet struck Carlson in the head, killing him instantly.

The district court in this case concluded that "[e]xigent circumstances existed at the time of each alleged violation of the warrant requirement and therefore no constitutional violation occurred." It did not consider how police action in the early hours of the conflict reduced the risk that Carlson could harm others. Nor did it consider whether Carlson's hours of inaction before, during, and after the tear gas assault undermined the defendants' claim of imminent danger. Instead, the court relied on a broad finding of perpetual exigency to hold that "the use of tear gas . . . was objectively reasonable" and therefore not an excessive use of force. Op. & Order 29. Addressing the tear gas, it concluded that "reasonable officers could believe that the first use of tear gas around 5:30 a.m. was necessary to prevent imminent harm to themselves in particular." *Id.* Likewise, the district court concluded that when they again flooded Carlson's house with tear gas an hour later, "nothing had terminated the exigency," so "reasonable officers could believe that the second round of tear gas was necessary to prevent imminent harm to themselves." *Id.* at 29–30. Thus, the district court believed that exigent circumstances existed at

No. 13-2643                         *Carlson v. Fewins, et al.*                         Page 8

9:00 p.m. when the police began surrounding Carlson in his house and continued unabated for more than twelve hours until the sniper killed him there the next morning.

## II.  Fourth Amendment Exigency

The Fourth Amendment prevents police officers from intruding into a person's house without first securing permission from a disinterested magistrate unless exigent circumstances would make it unreasonable to wait for judicial approval.  "To arrest a person in his home, police officers need both probable cause and either a warrant or exigent circumstances." *Goodwin v. City of Painesville*, 781 F.3d 314, 327 (6th Cir. 2015).  For exigent circumstances to excuse a warrantless search or seizure, there must be both "compelling need for official action and no time to secure a warrant." *Missouri v. McNeely*, 133 S. Ct. 1552, 1559 (2013) (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)).  "Police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure." *Terry v. Ohio*, 392 U.S. 1, 20 (1968).

Time is an essential factor when an *immediate* threat forms the basis for police claims of exigency.  We have held that "[e]xigent circumstances terminate when the factors creating the exigency are negated." *Bing v. City of Whitehall*, 456 F.3d 555, 565 (6th Cir. 2006) (citing *Mincey v. Arizona*, 437 U.S. 385, 393 (1978)).  If the dangers persist or increase, the exigent circumstances also persist. *See id.* ("The passage of time did not terminate the exigency because the ticking of the clock did nothing to cut off Bing's access to his gun, or cure him of his willingness to fire it, or move to safety the people nearby who refused to evacuate.").  But those dangers may diminish over time as police gain a measure of control, and when they do, the exigency and reasonableness of warrantless intrusions diminish in tandem.  When police initiate action after a long delay with no new provocation, the delay itself may suggest an unreasonable evasion of the Fourth Amendment rather than a reasonable response to a dynamic threat. *See O'Brien v. City of Grand Rapids*, 23 F.3d 990, 998 (6th Cir. 1994) ("[T]he fact that the officers waited four-and-a-half hours before deciding to use the first probe belies defendants' claim that exigent circumstances existed that prevented them from seeking a warrant.").

Any exigent circumstances that could have justified the warrantless use of tear gas and the throw phone would thus have to flow from some immediate threat posed by Carlson.  The

defendants do not claim to have been in hot pursuit of Carlson or otherwise concerned that he might destroy vital evidence. Indeed, nothing indicates that the Team was pursuing him for any past crimes, at least not for anything other than the possible reckless discharge of a weapon identified by Fewins as a likely misdemeanor. A misdemeanor such as that would not generally establish exigent circumstances to justify a warrantless entry into Carlson's house. *See Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984) ("When the government's interest is only to arrest for a minor offense, th[e] presumption of unreasonableness [that attaches to all warrantless home entries] is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate." (footnote omitted)).

Viewing the totality of the circumstances from the perspective of a reasonable officer at the time of the first tear gas barrage, Carlson was thought to be (and actually was) alone in the house. His neighbors were safely out of Carlson's reach (though not, as it turns out, entirely safe from the tear gas). The Team had Carlson contained with snipers and other officers carefully monitoring his floodlit house. Even after Carlson stopped responding to their negotiator, they had family members near at hand with open lines of communication. They had time to call a convenience store for refreshments; they had time to call a judicial officer.

The choice to call for granola bars but not a warrant appears to have been driven by the Sheriff's misunderstanding of the Fourth Amendment. "[I]nconvenience to the officers and some slight delay . . . are never very convincing reasons . . . to bypass the constitutional [warrant] requirement." *Johnson*, 333 U.S. at 15. Fewins's approach—choosing not to even request a warrant because he thought a misdemeanor arrest warrant would not have been "handy" or "put [the Team] in a better bargaining spot"—misses the point entirely. Judicial warrants are not intended to blindly facilitate whatever course of action a sheriff prefers. They are required by the Fourth Amendment "so that an objective mind might weigh the need to invade th[e] privacy [of the home] in order to enforce the law." *McDonald v. United States*, 335 U.S. 451, 455 (1948). The Fourth Amendment thus protects people from the power of the state by requiring judicial preapproval, time permitting, of intrusive or forceful entrances and seizures. *Johnson*, 333 U.S. at 13–14.

No. 13-2643                      *Carlson v. Fewins, et al.*                      Page 10

Instead of giving a sheriff the discretion to decide whether to seek a warrant from a neutral judicial officer based on how helpful the warrant would be to the sheriff, "[t]he point of the Fourth Amendment" is to vest the discretion to approve or deny an officer's plan to seize a person or search a house in a "neutral and detached magistrate." *Id.* The warrant requirement is relaxed when an emergency situation makes it unreasonable to delay long enough to seek one, not when—as Fewins suggests here—a warrant simply would not have been particularly useful in the field. The facts available at summary judgment raise an inference that the Team had the time—and thus the constitutional obligation—to get a warrant from a judge before entering Carlson's house with tear gas and surveillance equipment.

"We are not dealing with formalities." *McDonald*, 335 U.S. at 455. In this case, a neutral magistrate evaluating an application for an arrest warrant might have questioned the wisdom of a tear gas assault in response to Carlson's statement that he "kn[e]w at some point [they were] going to deploy tear gas, and when [they did], that w[ould] be the start of the war. And [he was] going [to] kill everybody." An objective judge might also have clarified whether the Team was trying to save a disturbed and dangerous man or take him into custody on a misdemeanor weapons charge. Whatever the goals, a judge setting parameters on the warrant might have taken note of experts' consistent advice to law enforcement that, "[t]echniques of eliciting compliance on the part of [emotionally disturbed] subjects that may work with criminal subjects are not likely to work with emotionally disturbed people" so "officers should remain calm, exercise restraint, reassure the subject, avoid excitement, and attempt to avoid gathering crowds." Michael Avery, *Unreasonable Seizures of Unreasonable People: Defining the Totality of the Circumstances Relevant to Assessing the Police Use of Force against Emotionally Disturbed People*, 34 Colum. Hum. Rts. L. Rev. 261, 293 (2003).

Longstanding precedent in this circuit leaves the factual question of exigent circumstances to the jury in a civil case. A quarter-century ago, a panel facing similar circumstances explained:

> Although, in a motion to suppress evidence in a criminal case, the factual determination whether exigent circumstances existed to excuse a warrantless arrest is a question for the court, *when the issue arises in a civil damage suit it is properly submitted to the jury providing, given the evidence on the matter, there is room for a difference of opinion.*

No. 13-2643 *Carlson v. Fewins, et al.* Page 11

> Here, there is very considerable room for disagreement . . . .
>
> . . . .
>
> Since there was room for disagreement whether any of the exigent circumstances existed that are ordinarily held to justify a warrantless arrest, we hold that the jury should have been given the issue to decide under proper instructions. We therefore remand for a new trial.

*Jones v. Lewis*, 874 F.2d 1125, 1130–31 (6th Cir. 1989) (emphasis added) (citations omitted); *accord O'Brien*, 23 F.3d at 998 ("In a civil damage suit, whether exigent circumstances existed to excuse a warrantless arrest is a question for the jury provided that, given the evidence on the matter, there is room for a difference of opinion.").

The Estate's evidence suggests that in the split second of their choosing and without a warrant of any kind, the Team decided to end hours of tense, quiet waiting by taking the precise action that Carlson had described as "the start of the war." A jury could find the totality of the circumstances made this unreasonable, not just with 20/20 hindsight, but from the perspective of any reasonable person responsible for rendering aid to an armed and obviously emotionally disturbed person and that no immediate danger exigency excused the various warrantless actions taken against Carlson while he was taking refuge in his home. In a situation such as this, where various inferences are possible, the courts have decided that the reasonableness of police conduct should be decided by a jury.

We therefore reverse the district court's order dismissing the counts against the county and the supervising officers and remand the case so a jury may decide whether the defendants' various warrantless seizures and searches during a standoff that began with requests to save Carlson's life and ended with a sniper shooting him dead were reasonable. We express no position on the merits of the alternative defenses pretermitted by the district court's erroneous conclusion that exigent circumstances excused the warrant requirement—i.e., whether municipal liability attaches to the choices made by Fewins and Drzewiecki. *See generally Pembauer v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ("We hold that municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.").

No. 13-2643                     *Carlson v. Fewins, et al.*                     Page 12

### III.  Use of Force Policy

The Estate also challenges later rulings by the district court during the trial of the remaining defendant, the sniper Charles Jetter.  The Estate argues that it should have been permitted to argue that Jetter's fatal shot violated a departmental "Use of Force Policy"[4] in support of its broader argument that Jetter's shot was objectively unreasonable under the Fourth Amendment.  That Policy states in relevant part:  "Before using lethal force, police officers shall identify themselves and state their intent to use lethal force, where feasible."  The Estate argues that this made it unreasonable for Jetter to shoot without first warning Carlson and that the jury should have been so informed.  The Estate interprets the Policy as requiring Jetter to issue a verbal warning before firing, thus disregarding the "where feasible" language, Jetter's role as a sniper, and his claim of danger to the other officer.  In the language of the Policy it was not "feasible" for a camouflaged sniper to identify himself and shout a warning when a suspect is preparing to fire on another officer.  Moreover, the policy does not set the constitutional standard required by the Fourth Amendment, so it was not improper for the district court to limit the Estate's use of that document at trial.

Although the Policy was already in evidence, the district court would not allow the Estate to use it to cross examine Jetter's expert to establish "what is objectively reasonable when it

---

[4]The Use of Force Policy is an internal policy document that the Northern Michigan Mutual Aid Task Force—the multi-jurisdictional organization behind the Emergency Response Team involved in this operation—uses to "provide police officers with guidelines on the use of lethal and less [than] lethal force." Northern Michigan Mutual Aid Task Force Policy on Use of Force, 1.  It presents the following "[p]arameters for the use of lethal force":

1. Police officers are authorized to use lethal force in order to;
    a. Protect the police officer or others from immediate threat of death or serious bodily harm; or,
    b. Prevent the escape of a fleeing felon whom the officer has probable cause to believe will pose a significant threat to human life should escape occur.
2. Before using lethal force, police officers shall identify themselves and state their intent to use lethal force, where feasible.
3. In high risk incidents such as barricaded gunmen or hostage takers, circumstances may dictate the use of lethal force to resolve the incident.
    a. The order to use lethal force will be given directly from the agency head of the requesting jurisdiction to the [Team] Commander.
    b. The Team Leader will relay the order directly to the element that will execute the order (Sniper, Entry Team).
    c. In the event the agency head is not available, the order will be given by the Command Officer designated as the acting agency head.
    d. The Team Leader will authenticate the origin of the order visually or verbally.

*Id.* at 2.

No. 13-2643 *Carlson v. Fewins, et al.* Page 13

comes to a claim under the Fourth Amendment." Trial Tr. 1746. The district court explained further: "The law is clear that the policy doesn't set forth the [constitutional] standard, that's why you need an expert witness, which I guess you are not going to call, I guess. You can't use a policy to create a [constitutional] standard." *Id.* The district court was correct. *See Smith v. Freeland*, 954 F.2d 343, 347-48 (6th Cir. 1992) ("A city can certainly choose to hold its officers to a higher standard than that required by the Constitution without being subjected to increased liability under § 1983. To hold that cities with strict policies commit more constitutional violations than those with lax policies would be an unwarranted extension of the law, as well as a violation of common sense."). We affirm that ruling.

### IV. Spoliation Instructions

The Estate believed that the defendants were responsible for the unavailability of evidence that might have supported its case—more complete logs and recordings of police radio transmissions and the clothing that Carlson was wearing when he died. It asked the district court to instruct the jury to assume that the missing evidence would have supported the Estate's theory of the case against Jetter. "[A]n adverse inference for evidence spoliation is appropriate if the [d]efendants knew the evidence was relevant to some issue at trial and their culpable conduct resulted in its loss or destruction." *Adkins v. Wolever (Adkins II)*, 692 F.3d 499, 504 (6th Cir. 2012) (quoting *Beaven v. United States Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010)). "It is within a district court's inherent power to exercise broad discretion in imposing sanctions based on spoliated evidence." *Adkins v. Wolever (Adkins I)*, 554 F.3d 650, 653 (6th Cir. 2009). If the district court had concluded that Jetter's conduct caused the loss of any relevant evidence, it could have imposed sanctions, including instructing the jury to assume that the spoliated evidence supported the Estate's theory of the case. The Estate argues that the district court erred by declining to issue such an instruction regarding the communication records and the clothing.

Beginning with the communications records, the Estate argued that the logs and recordings maintained by the 911 system were altered or incomplete and that the defendants withheld and then destroyed relevant recordings from that evening. Uncontroverted testimony from the 911 Director indicated that neither Jetter nor even the 911 dispatchers who log the communications could have altered the logs. The testimony indicated that the "gaps" in the

No. 13-2643    *Carlson v. Fewins, et al.*    Page 14

911 transcripts during the operation that seemed suspicious to the Estate were caused by the officers on the scene using a local frequency not monitored by the 911 dispatchers, a standard practice. The Director also testified that she provided the Estate with copies of all requested recordings and only destroyed the backups more than a year later when the department updated its equipment.

Turning to the missing blood-stained clothing, the Estate argued that Jetter was present in the morgue where the clothing disappeared and could have removed evidence that might have contradicted his testimony that Carlson was raising his rifle when Jetter shot him. The Estate had no direct witnesses to the shooting to contradict the officers' accounts of Carlson leaning out the window, shouldering the rifle, and fingering the trigger. Instead, they presented a blood spatter analyst who testified that the bullet entered Carlson's head inside the house: seven to thirteen inches inside the window and between five feet, eight inches and six feet above the floor. That witness also testified that the blood spatter patterns on Carlson's rifle suggested that it was "in a lower position than shouldered" and Carlson's finger was not on the trigger.

The same witness testified about Carlson's shirt, which went missing sometime around the time of his postmortem exam. The Estate's expert described a decedent's clothing as "one of the most basic pieces of evidence to submit in a situation like this." She explained that analyzing blood spatter and unstained regions on the shirt would have allowed a more precise and confident reconstruction of how Carlson and his rifle were positioned when he was shot. The Medical Examiner who conducted Carlson's postmortem exam also testified. He testified that he and his assistant removed Carlson's clothing, bagged it, and placed the bag "on top of the body bag and . . . into the [morgue] refrigerator." That clothing was missing when Carlson's body was removed from the morgue. While the Medical Examiner initially signed an affidavit indicating that Jetter was present during the examination, he recanted that statement at trial.

The district court offered independent reasons for rejecting the two proposed spoliation instructions: no communication records appeared to have gone missing, and Jetter did not seem to have been responsible for the disappearance of Carlson's clothing. These conclusions are adequately supported by the record. While the Estate points to gaps in the communication records as evidence of skulduggery, uncontroverted testimony indicated that those gaps reflect

No. 13-2643                     *Carlson v. Fewins, et al.*                     Page 15

the routine use of short-range, unmonitored frequencies for on-site communications. Likewise, the affidavit the Estate uses to argue that Jetter was present during the autopsy was repudiated by the affiant, the Medical Examiner, in testimony in front of the district court. Accordingly, the district court did not abuse its discretion by denying the request for spoliation instructions against Jetter. We affirm the trial court's decision regarding those instructions.

## V. Summary

For the foregoing reasons, we reverse the district court's grant of summary judgment to defendants Scott Fewins, Steve Drzewiecki, and Grand Traverse County and remand those claims for jury trial. We affirm the district court's rulings in the jury trial of defendant Charles Jetter.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 13-2643

ROBERT CARLSON, Personal Representative of
the Estate of Craig Carlson,

        Plaintiff - Appellant,

   v.

SCOTT FEWINS; CHARLES JETTER, Individually
and Officially; GRAND TRAVERSE COUNTY, a Municipal
Corporation; STEVE DRZEWIECKI, Individually and
Officially,

        Defendants - Appellees.

> **FILED**
> Sep 11, 2015
> DEBORAH S. HUNT, Clerk

Before: COLE, Chief Judge; MERRITT and BATCHELDER, Circuit Judges.

**JUDGMENT**

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the district court's grant of summary judgment to defendants Scott Fewins, Steve Drzewiecki, and Grand Traverse County is REVERSED, and these claims are REMANDED for jury trial. IT IS FURTHER ORDERED that the district court's rulings in the jury trial of Charles Jetter are AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk